FILED IN
COURT OF CRIMINAL APPEALS

November 13, 2015

ABEL ACOSTA, CLERK

AP-77,043
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/12/2015 9:27:50 PM
Accepted 11/13/2015 8:05:46 AM
ABEL ACOSTA
CLERK

**NO. AP-77,043**

IN THE TEXAS COURT OF CRIMINAL APPEALS

AT AUSTIN, TEXAS

_____

**THE STATE OF TEXAS,**
*Appellant,*
v.
**LARRY RAY SWEARINGEN,**
*Appellee.*

_____

*Arising from:*

**Cause No. 99-11-06435-CR**
IN THE DISTRICT COURT
FOR THE NINTH JUDICIAL DISTRICT
MONTGOMERY COUNTY, TEXAS

_____

**APPELLEE LARRY RAY SWEARINGEN'S MOTION FOR REHEARING**
_____

**BRYCE BENJET**
Tex. Bar. No. 24006829
The Innocence Project
Attorney at Law
40 Worth Street, Suite 701
New York, New York 10013

**JAMES G. RYTTING**
**Philip Hilder**
Hilder & Associates, P.C.
819 Lovett Boulevard
Houston, Texas 77006

Counsel for Appellee

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

District Attorney:                    BRETT W. LIGON
                                      District Attorney
                                      Montgomery County, Texas
                                      207 W. Phillips, Second Floor
                                      Conroe, Texas 77301

Counsel for the State:                WILLIAM J. DELMORE III
                                      Assistant District Attorney
                                      Montgomery County, Texas
                                      207 W. Phillips, Second Floor
                                      Conroe, Texas 77301

Appellee:                             LARRY RAY SWEARINGEN

Counsel for Appellee:                 JAMES G. RYTTING
                                      Hilder & Associates, P.C.
                                      819 Lovett Boulevard
                                      Houston, Texas 77006

                                      BRYCE BENJET
                                      Tex. Bar. No. 24006829
                                      The Innocence Project
                                      40 Worth Street, Suite 701
                                      New York, New York 10013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE CASE ...............................................................................1

ARGUMENT ........................................................................................................3

I.  Reliance on "Overwhelming" Evidence Ignores the Realities of DNA Testing in Criminal Cases.................................................................................3

II.  The Court's Restrictive Standard for Considering Possible Exculpatory Results Is Inconsistent with Prior Decisions and Does Not Reflect Legislative Intent.............................................................................6

III.  No Other Jurisdiction Similarly Restricts Access to Postconviction DNA Testing.........................................................................10

IV.  The Majority's Restrictive Definition of Exculpatory Results Will Bar Access to Postconviction DNA Testing in All But a Narrow Category of Cases...............................................................................12

V.  Applying the Proper Construction of Exclusionary DNA Test Results, DNA Testing Is Warranted in this Case. ..................................................16

CONCLUSION AND PRAYER ...........................................................................19

**TABLE OF AUTHORITIES**

**CASES**

*Ex parte Arledge*,
No. AP-76974, 2013 WL 831138 (Tex. Crim. App. Mar. 6, 2013)..............15

*Ex parte Arledge*,
No. 21693, 2013 WL 11028491 (Tex. Crim. App. Feb. 11, 2013)..............15

*Blacklock v. State*,
235 S.W.3d 231 (Tex. Crim. App. 2007) ....................................................6, 7

*Brady v. Maryland*,
373 U.S. 83 (1963)..................................................................................9, 10

*Commonwealth v. Conway*,
14 A.3d 101 (Pa. 2011)..................................................................................11

*Ex parte Criner*,
No. 36,856-01 (Tex. Crim. App. July 8, 1998) ...........................................3, 5

*Ex parte Criner*,
No. 87-09-00591-CR-(1) (410th Dist. Ct., Montgomery County, Tex.,
July 28, 2000) ..............................................................................................3, 18

*Ex parte Criner*,
No. 87-09-00591-CR-(1) (410th Dist. Ct., Montgomery County, Tex.,
Aug. 15, 2000) ...............................................................................................3, 4

*District Attorney's Office for Third Judicial District v. Osborne*,
557 U.S. 52 (2009)............................................................................................5

*Hardin v. Commonwealth*,
396 S.W.3d 909 (Ky. 2013)...........................................................................11

*House v. Bell*,
547 U.S. 518 (2006).......................................................................................10

*Ex parte Miles*,
359 S.W.3d 647 (Tex. Crim. App. 2012) ....................................................9, 10

*In re Morton*,
326 S.W.3d 634 (Tex. App.–Austin 2010, no pet.)...............................14, 15

*Maryland v. King*,
133 S.Ct. 1958 (2013)...................................................................................5

*New Jersey v. DeMarco*,
904 A.2d 797 (N.J. Super. Ct. App. Div. 2006) ...........................................11

*Ohio v. Noling*,
992 N.E.2d 1095 (Ohio 2013) .....................................................................11

*Pena v. State*,
353 S.W.3d 797 (Tex. Crim. App. 2011) ......................................................9

*Pope v. State*,
756 S.W.2d 401 (Tex. App.–Dallas 1988, pet. ref'd)................................4, 5

*Powers v. Tennessee*,
343 S.W.3d 36 (Tenn. 2011) ...................................................................11, 12

*Ex parte Pruett*,
No. B-01-M015-PR-B (156th Dist. Ct., Bee County, Tex., Apr. 28,
2015) .........................................................................................................8, 9

*Raby v. State*,
No. AP-74,930, 2005 Tex. Crim. App. LEXIS 2194 (Tex. Crim. App.
June 29, 2005)...................................................................................7, 8, 9, 14

*Robinson v. State*,
No. C14-87-00345-CR, 1989 WL 102335 (Tex. App.–Houston [14th
Dist.] Sept. 7, 1989, pet. ref'd)..................................................................4, 5

*Routier v. State*,
273 S.W.3d 241 (Tex. Crim. App. 2008) ...............................................7, 8, 9

*State v. Butler*,
21 A.3d 583 (Conn. App. Ct. 2011) ............................................................11

*State v. Swearingen*,
Nos. AP–77,043, AP–77,044, 2015 WL 6513883 (Tex. Crim. App.
Oct. 28, 2015) .......................................................................................*passim*

iv

*State v. Swearingen*,
424 S.W.3d 32 (Tex. Crim. App. 2014) ........................................................18

*Swearingen v. State*,
101 S.W.3d 89 (Tex. Crim. App. 2003) .................................................16, 17

*United States v. Sczubelek*,
402 F.3d 175 (3d Cir. 2006) .............................................................................6

## STATUTES

Act of June 17, 2011, 82d Leg., R.S., ch. 278, §§ 5, 6, 2011 Tex. Sess. Law
Serv. 883 (West) ...............................................................................................8

Act of June 17, 2011, 82d Leg., R.S., ch. 366, §§ 1, 2, 3, 2011 Tex. Sess.
Law Serv. 1016 (West) .................................................................................8, 9

Act of May 16, 2013, 83rd Leg., R.S., ch. 49, 2013 Tex. Gen. Laws 106
(West).............................................................................................................16

Act of May 22, 2015, 84th Leg., R.S., ch. 70, §§ 1, 2, 2015 Tex. Sess. Law
Serv. (West) .....................................................................................................9

Miss. Code Ann. § 99-39-11(10) (West Supp. 2014)...............................................11

N.Y. Crim. Proc. Law § 440.30(1-a)(c) (McKinney Supp. 2015)...........................11

S.J. of Tex., 80th Leg., R.S. 300 (2007) (Senate Resolution 341) ...........................4

Tex. Code Crim. Proc. Ann. art. 38.43(i) (West Supp. 2015) ..................................9

Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A) (West Supp. 2015) ..............*passim*

## OTHER AUTHORITIES

Committee on Identifying the Needs of the Forensic Sciences Community,
National Research Council, *Strengthening Forensic Science in the
United States: A Path Forward* 175-76 (2009), *available at*
https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf ...............................17

*Exonerated: Cases by the numbers*, CNN, http://
www.cnn.com/2013/12/04/justice/prisoner-exonerations-facts-
innocence-project/ (last visited Nov. 11, 2015).............................................10

Jessica Hamel & Ryan Murphy, *Search: Pardons by Gov. Rick Perry*, Texas Tribune (Aug. 6, 2014), http://www.texastribune.org/library/data/search-texas-governor-rick-perry-pardons/ ..................................................................................................4

Rhonda Williams, PhD & Roger Kahn, PhD, *Forensic DNA Collection at Death Scenes: A Pictorial Guide* 1 (2014) ...............................................5, 13

Terry Melton, Motochondiral DNA Examination of Cold Case Crime Scene Hairs, Forensic Magazine (April 1, 2009) (http://www.forensicmag.com/articles/2009/04/mitochondrial-dna-examination-cold-case-crime-scene-hairs)......................................................13

**STATEMENT OF THE CASE**

Appellee Larry Ray Swearingen has sought postconviction DNA testing for over a decade to prove his innocence of the capital murder of Mellissa Trotter. A Majority of this Court now reverses the judgment of the court of conviction which granted DNA testing on probative physical evidence that would unquestionably have been tested if Ms. Trotter's murder were investigated today. While Appellee disagrees with the Majority for many of the same reasons discussed in the dissenting opinions, this Motion for Rehearing focuses on the controlling issue of the Majority's erroneous construction of the statutory consideration of potential "exculpatory results" of DNA testing. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A) (West Supp. 2015).

The Majority Opinion bars a trial judge from considering the known fact that DNA testing *can identify with certainty* a person whose biological material is present *on the victim* and *at the crime scene*. *See* Majority Opinion, 2015 WL 6513883, at *4–5 (attached as Exhibit A). Disregarding this central strength of DNA technology, the Majority confines the universe of potential exculpatory results considered in determining the impact of DNA testing to the mere exclusion of the convicted person as the source of biological evidence. *See id.* If this artificial and arbitrary definition stands, it will eliminate the broad access to DNA

1

testing that has been the centerpiece of recent criminal justice reforms which place Texas at the forefront of jurisdictions confronting wrongful convictions.

By rejecting the very assumptions used every day in the course of forensic criminal investigation, the Majority's standard will prevent access to DNA testing in large categories of cases where the right to such testing should be uncontroversial and where this Court has recognized that such testing proved innocence by clear and convincing evidence. Because this is not what our Legislature intended, this Court should grant rehearing to consider the case under a standard consistent with the intent of Chapter 64 of the Texas Code of Criminal Procedure, reflecting the now universal norm of broad access to postconviction DNA testing.

# ARGUMENT

## I. Reliance on "Overwhelming" Evidence Ignores the Realities of DNA Testing in Criminal Cases.

Although the Majority's reliance on "overwhelming" evidence of guilt (or its description of a "mountain of inculpatory evidence") has a certain rhetorical appeal, Majority Opinion, 2015 WL 6513883, at *3–4 & n.17 (citations omitted), this characterization describes almost every criminal conviction. Proof of guilt beyond a reasonable doubt is a prerequisite for criminal convictions, leaving few (if any) in which a judge might not reasonably consider the inculpatory evidence "overwhelming." And one need not leave Montgomery County to learn that a finding of "overwhelming" evidence of guilt has not proven to be an accurate predictor of the results of a DNA test. In the similar murder case of Roy Criner, this Court denied habeas relief citing overwhelming direct evidence of his guilt. But Mr. Criner was later pardoned after additional DNA testing showed he was not the murderer. *See Ex parte Criner*, No. 36,856-01, at 1 (Tex. Crim. App. July 8, 1998) (discounting impact of DNA exclusion from semen in murder victim, citing "overwhelming" direct evidence of guilt); *Ex parte Criner*, No. 87-09-00591-CR-(1) (410th Dist. Ct., Montgomery County, Tex., July 28, 2000), *available at* http://www.mctx.org/courts/410th_district_court/docs/criner1.pdf (recommending a full and complete pardon for Roy Criner after DNA from semen matched DNA from cigarette butt); *Ex parte Criner*, No. 87-09-00591-CR-(1) (410th Dist. Ct.,

3

Montgomery County, Tex., Aug. 15, 2000), *available at* http://www.mctx.org/

courts/410th_district_court/docs/criner.pdf (releasing Criner with an apology).

Texas courts have likewise found "overwhelming" evidence of guilt in the

cases of David Pope and Anthony Robinson even though DNA testing later proved

them innocent.  David Pope was pardoned for innocence despite a prior finding

that the admission of "voiceprint" technology was harmless in light of the

"overwhelming evidence" of guilt.  *See Pope v. State*, 756 S.W.2d 401, 403–04

(Tex. App.—Dallas 1988, pet. ref'd) ("overwhelming evidence against appellant"

included eyewitness identification and defendant's possession of knife and clothing

matching victim's description); Jessica Hamel & Ryan Murphy, *Search: Pardons*

*by Gov. Rick Perry*, Tex. Trib. (Aug. 6, 2014), http://www.texastribune.org/library/

data/search-texas-governor-rick-perry-pardons/ (pardon for innocence granted to

David Pope).  Anthony Robinson was pardoned based on DNA evidence despite a

prior finding that errors at his trial were harmless in light of "overwhelming

evidence of appellant's guilt" including the victim's identification made within 15

minutes of her reporting the assault and Robinson's possession of a loaded gun at

the time of his arrest.  *See Robinson v. State*, No. C14-87-00345-CR, 1989 WL

102335, at *1, *7 (Tex. App.—Houston [14th Dist.] Sept. 7, 1989, pet. ref'd); S.J.

of Tex., 80th Leg., R.S. 300, 300–01 (2007) (Senate Resolution acknowledging

Robinson's pardon based on DNA evidence).

As demonstrated by the outcomes in *Criner*, *Pope*, and *Robinson*, the Majority's citation to "overwhelming" evidence ignores the exceptional power of DNA testing in the forensic context to overcome such evidence, not simply by excluding a suspect, but also by identifying the actual source of the DNA. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009) ("DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty."). In fact, a recently published best practices guide by Harris County Institute of Forensic Sciences (HCIFS) lab director Dr. Roger Kahn and HCIFS's DNA Trace Evidence Collection team leader Dr. Rhonda Williams on the collection of forensic DNA evidence also emphasizes the role of DNA databases as a central component of modern forensic DNA testing. *See* Rhonda Williams, PhD & Roger Kahn, PhD, *Forensic DNA Collection at Death Scenes: A Pictorial Guide* 1 (2014) (HCIFS expanded evidence it routinely tests because "touched objects often provided full or nearly full DNA profiles that matched an offender in CODIS," resulting in HCIFS leading the State in "the total number of CODIS offender matches") (attached as Exhibit B). Federal courts have also cited the importance of using DNA databases in the postconviction context. *See Maryland v. King*, 133 S.Ct. 1958, 1974 (2013) (identification of arrestee "as perpetrator of some heinous crime may have the salutary effect of freeing a person

5

wrongfully imprisoned for the same offense"); *United States v. Sczubelek*, 402 F.3d 175, 1985 (3rd Cir. 2006).

Based on the universal understanding of how forensic DNA testing works, any accurate assessment of the potential exculpatory results from such testing must include consideration of the following potential results:

- Finding no DNA;

- Detecting an unknown DNA profile on a single piece of evidence;

- Detecting the same (or different) DNA profiles on multiple pieces of evidence across a crime scene; and

- Identifying the source of foreign DNA profile detected on single or multiple samples either by one-to-one comparison to a known suspect or through a match from a CODIS database search.

By contrast, the standard articulated by the Majority places blinders on Texas judges and denies courts the ability to consider the most persuasive category of proof of innocence—the identification of a guilty third party. This drastically increases the risk of wrongful imprisonment and execution.

## II.    The Court's Restrictive Standard for Considering Possible Exculpatory Results Is Inconsistent with Prior Decisions and Does Not Reflect Legislative Intent.

This Court's jurisprudence on the definition of "exculpatory results" is unsettled and has led to inconsistent applications of the Chapter 64 gateway to postconviction DNA testing. The Majority's limited definition of "exculpatory results" was adopted from the Court's 2007 holding in *Blacklock v. State*, in which

6

the Court granted DNA testing based on Blacklock's 2005 motion contending that his exclusion from DNA on a rape kit would prove innocence. *See* 235 S.W.3d 231, 232 (Tex. Crim. App. 2007). Although the question of a one-to-one comparison or CODIS search was not before the Court, the Majority has seized on the language in *Blacklock* to prohibit any "speculation" beyond the mere exclusion of the convicted person, Majority Opinion, 2015 WL 6513883, at *3–4 & n.13. The Majority defends its restrictive standard by claiming that the Legislature did not intend a low threshold for access to DNA testing. *Id.* at 10, n.17.

But this Court's prior decisions and the Legislature's consistent broadening of access to DNA testing under Chapter 64 contradicts the Majority's analysis. This Court has previously engaged in a more robust analysis of the potential "exculpatory results" under Chapter 64 that more closely resembles the actual use of forensic DNA testing in criminal investigation. In *Routier v. State*, 273 S.W.3d 241 (Tex. Crim. App. 2008), this Court held that the analysis of exculpatory DNA results includes both (1) excluding the convicted person and (2) identifying a consistent DNA profile on multiple items of evidence.

Similarly, Judge Johnson's majority opinion in *Raby v. State*, No. AP-74,930, 2005 Tex. Crim. App. LEXIS 2194 (Tex. Crim. App. June 29, 2005) (unpublished) reversed the trial court's denial of DNA testing, factoring in the potential for comparison of a DNA profile to known suspects as part of the

7

exculpatory results analysis.  *See id.* at *21 ("There are a maximum of four items to be tested and few suspects for comparison.").  The Majority's statutory construction is also at odds with a recent order by Judge Richardson (sitting by assignment as trial judge) granting DNA testing on tape collected from the handle of a shank used in a prison murder.  *See Ex parte Pruett*, No. B-01-M015-PR-B (156th Dist. Ct., Bee County, Tex., Apr. 28, 2015).  Although Judge Richardson's reasoning is not provided in that order, it is hard to contemplate how the mere exclusion of Pruett from the handle of a prison shank (the limit of the Court's analysis under the Majority Opinion in this case) would prove innocence without consideration of the same appropriate and reasonable "speculation" utilized in *Routier* and *Raby*, e.g., that potential innocent contributors of DNA would be excluded and the source of any foreign DNA detected would be identified.

Since *Routier*, Chapter 64 was amended to *expand* access to DNA testing by broadening the definition of "biological material," requiring that DNA profiles be compared to DNA databases[1] and most recently by lowering the standard of proof for the existence of biological material on evidence to be tested.  *See* Act of June 17, 2011, 82d Leg., R.S., ch. 278, §§ 5, 6, 2011 Tex. Sess. Law Serv. 883, 885 (West) (to be codified at Tex. Code Crim. Proc. Ann. arts. 64.01, 64.035); Act of

---

[1] The express requirement of a database search on DNA profiles generated under Chapter 64 is clear evidence of legislative intent for the same database search to be considered under article 64.03(a)(2)(A).

8

June 17, 2011, 82d Leg., R.S., ch. 366, §§ 1, 2, 3, 2011 Tex. Sess. Law Serv. 1016, 1016–17 (West) (to be codified at Tex. Code Crim. Proc. Ann. arts. 64.01, 64.035, 64.04); Act of May 22, 2015, 84th Leg., R.S., ch. 70, §§ 1, 2, 2015 Tex. Sess. Law Serv. (West) (to be codified at Tex. Code Crim. Proc. Ann. arts. 64.01(a-1), 64.03(a)).  The Legislature's intent for broad access to DNA testing in criminal cases can also be inferred by the addition of Article 38.43(i) to the Texas Code of Criminal Procedure which imposes a mandatory requirement that all biological evidence be tested before the jury is empaneled in any capital case.  *See* Tex. Code Crim. Proc. Ann. art. 38.43(i) (West Supp. 2015)  The Majority's restrictive approach runs counter to this clear Legislative intent and is inconsistent with the application of Chapter 64 in *Routier*, *Raby,* and *Pruett*.

Further, this Court's treatment of the term "exculpatory" in other contexts also warrants a broad interpretation in the DNA testing context.  "Exculpatory" was well-defined back in *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963), and is generally understood as anything favorable to the defendant.  *See Pena v. State*, 353 S.W.3d 797, 811–12 (Tex. Crim. App. 2011).  Further, the definition of exculpatory evidence includes both the new information as well as the natural consequences of the new information coming to light.  *See Ex parte Miles*, 359 S.W.3d 647, 666–67 (Tex. Crim. App. 2012) (explaining that police reports

9

identifying alternative suspects were "exculpatory" under *Brady* because their disclosure "could have led to further investigation of other suspects and theories").

Evidence pointing to a specific third-party's guilt is a classic example of exculpatory evidence under *Brady* and is arguably the most persuasive type of evidence of innocence. *See Ex parte Miles*, 359 S.W.3d 647, 666–67 (Tex. Crim. App. 2012); *House v. Bell*, 547 U.S. 518, 548 (2006) (evidence undermining State's case against House would not have proved innocence without other evidence pointing to a different suspect). Indeed, an alternative suspect is identified in nearly 50% of all DNA exonerations. *See Exonerated: Cases by the numbers*, CNN, http://www.cnn.com/2013/12/04/ justice/prisoner-exonerations-facts-innocence-project/ (last visited Nov. 11, 2015). Where the statute requires that hypothetical "exculpatory results" meet the extraordinarily high burden of proof of probable innocence, the Majority Opinion will deprive convicted persons of arguably the most powerful category of evidence accepted by courts to make this showing.

## III. No Other Jurisdiction Similarly Restricts Access to Postconviction DNA Testing.

Just as Texas courts have done in the *Brady* context, jurisdictions across the nation have defined potential exculpatory DNA results as the exclusion of the defendant from the DNA profile obtained *and* all realistic possibilities that flow

10

from such exclusion.  Tennessee courts, for example, have construed a Chapter 64

equivalent to allow for consideration of all "realistically possible" exculpatory

results:

> "'[T]he trial court should postulate whatever realistically possible test results would be most favorable to [the] defendant in determining whether he has established'" the statutory reasonable probability requirement.

*Powers v. Tennessee*, 343 S.W.3d 36, 55 (Tenn. 2011) (second alteration in

original) (quoting *New Jersey v. Peterson,* 836 A.2d 821, 827 (N.J. Super. Ct. App.

Div. 2003)).  Reflecting the reality of DNA testing, a plethora of jurisdictions

expressly require consideration of potential DNA results identifying a known

suspect through a CODIS database search, when weighing a post-convition DNA

motion.  *See, e.g.*, *Powers*, 343 S.W.3d at 58 (most favorable result would be

match of DNA profile to prior offender in DNA database); *Hardin v.*

*Commonwealth*, 396 S.W.3d 909, 915 (Ky. 2013) (non-statutory postconviction

DNA motion); *Ohio v. Noling*, 992 N.E.2d 1095, 1105 (Ohio 2013); *State v.*

*Butler*, 21 A.3d 583, 588 (Conn. App. Ct. 2011); *Commonwealth v. Conway*, 14

A.3d 101, 114 (Pa. 2011); *New Jersey v. DeMarco*, 904 A.2d 797, 807 (N.J. Super.

Ct. App. Div. 2006); *see also* Miss. Code Ann. § 99-39-11(10) (West Supp. 2014);

N.Y. Crim. Proc. Law § 440.30(1-a)(c) (McKinney Supp. 2015).

As the Tennessee Supreme Court explained,

> "data bank comparative analysis [is used] in the investigation of crimes" and . . . "nationwide there are a multitude of reported cases in which law enforcement agencies have used data bank information to solve crimes where the identification of the perpetrator was in question."

*Powers*, 343 S.W.3d at 58 (quoting *Conway*, 14 A.3d at 113 n.14 (alteration in original)).[2]

## IV. The Majority's Restrictive Definition of Exculpatory Results Will Bar Access to Postconviction DNA Testing in All But a Narrow Category of Cases.

By dismissing as too "speculative" any potential DNA result beyond the exclusion of the convicted person, the Majority eliminates the routine speculation inherent in virtually any assessment of DNA results. *See* Majority Opinion, 2015 WL 6513883, at *4. The dramatic barrier to access to DNA testing erected by the Majority is evident even in cases where such testing is widely recognized to be essential.

For example, the Majority's construction of Article 64.03(a)(2)(A) would produce the absurd result of barring access to DNA testing of rape kits in single-perpetrator rape cases involving an adult woman. This is because excluding the convicted person from DNA found in sperm, without more, would establish only that the victim had sexual intercourse with *someone* within a few days before the

---

[2] Although not every state court has considered this issue, our research has not uncovered a single jurisdiction imposing similar limitations on the exculpatory nature of DNA results to be considered in determining access to postconviction DNA testing.

crime.  *See* Majority Opinion, 2015 WL 6513883, at *3 n.13.  Additional

speculation (which the Majority prohibits) is required for the Court to assume that

any consensual sexual partner of the victim can be identified, a DNA sample from

such person could be obtained, and DNA testing would exclude that person from

the sample.  Thus, even when considering the gold standard of DNA evidence—

intimate samples from rape cases—the Majority would allow postconviction

testing only where the trial record establishes that the victim was not sexually

active.

The Majority's construction will also prevent access to postconviction DNA

testing in the vast majority of trace evidence cases.  Take, for example, a case

involving a request to test hairs collected from a murder victim's clothing or skin

cells from a murder weapon.  Because humans shed 75–100 hairs each day[3] and

skin cells are transferred even when we casually touch objects,[4]  excluding a

convicted person from these highly probative items of physical evidence alone

likely cannot meet the burden of proof under Article 64.03(a)(2)(A).  For DNA

evidence to prove innocence in this context, a trial judge must speculate that the

DNA profile obtained also excludes those persons such as family members,

---

[3] Terry Melton, Motochondiral DNA Examination of Cold Case Crime Scene Hairs, Forensic
Magazine (April 1, 2009) (http://www.forensicmag.com/articles/2009/04/mitochondrial-dna-
examination-cold-case-crime-scene-hairs).

[4] *Williams* & *Kahn* at 85 (epithelial cells deposited when assailant grabs or rubs clothing).

friends, or coworkers whose hair or skin cells could have been innocently transferred to the victim. *Cf.* Majority Op. at 8 n.13 (speculating that there are innocent ways foreign DNA can be found on victim); *but see Raby*, 2005 Tex. Crim. App. LEXIS 2194, at *18–21.

The striking barrier to DNA testing created by the Majority is best shown in the case of Michael Morton, who was exonerated by this Court based on exculpatory DNA testing of a bandana found 100 yards away from the crime scene. *See In re Morton*, 326 S.W.3d 634, 638–39 (Tex. App.–Austin 2010, no pet.). There was no obvious link between the bandana and the crime, and merely excluding Morton from unidentified DNA profiles on the bandana would have proven nothing. Instead, Morton argued that "DNA testing of the bandana would be exculpatory in the event that the bandana contains [the victim]'s blood, a third party's DNA (due to blood sweat or hair), and none of appellant's DNA." *Id*. at 641. The Third Court of Appeals reversed the trial court's denial of DNA testing, holding that exculpatory results could include the identification of the victim's blood and the DNA of someone other than the defendant. *See id*. at 644, 647–48.

In fact, the DNA testing proved more than this: the bandana contained both the victim's blood and that of a database match with felon Mark Norwood. This testing led not only to Norwood's conviction for the murder of Christine Morton, but also to Norwood's indictment for a similar murder in Travis County. Had the

14

Majority's restrictive definition of "exculpatory results" under Article 64.03(a)(2)(A) been utilized, the court would have refused to "speculate" that the blood on the bandana would be associated with the victim, Morton would have remained wrongfully imprisoned for the murder of his own wife, and Norwood would have evaded justice for two murders.

The Majority's focus only on DNA exclusions would also have prevented the exoneration of Randy Arledge. Specifically, postconviction DNA testing revealed that Mr. Arledge was excluded biological material in the victim's car and on her body. A database hit then linked the biology to a felon who committed a similar stabbing and admitted being in the area where the crime was committed. *See Ex parte Arledge*, No. AP-76974, 2013 WL 831138, at *1 (Tex. Crim. App. Mar. 6, 2013) (adopting the trial court findings and holding that Arledge was factually innocent). Memorandum, *Ex parte Arledge*, No. 21693, 2013 WL 11028491, at *2, *4–6 (Dist. Ct. Navarro County, Tex. February 11, 2013). Arledge could never have proven his innocence based only on the mere presence of unidentified DNA, and under the Majority's analysis, should have been denied testing. The *Morton* and *Arledge* cases are but two examples of how the Majority's artificially narrow definition of exculpatory DNA results will almost always fail to

15

"factually exclude" the defendant, *see* Majority Opinion, 2015 WL 6513883, at *3

& n.13—thus vitiating the entire purpose of Chapter 64.[5]

## V.  Applying the Proper Construction of Exclusionary DNA Test Results, DNA Testing Is Warranted in this Case.

The Majority concedes that, but for its restrictive definition of "exculpatory

results", Mr. Swearingen would be entitled to DNA testing. *See* Majority

Opinion, 2015 WL 6513883, at *4 n.17 ("Such compelling DNA results would

certainly overcome any mountain of inculpatory evidence.").

Indeed, under the proper standard for exculpatory results, the requested

DNA testing outweighs the circumstantial "mountain"[6] of evidence. The discovery

---

[5] After Morton was exonerated through postconviction DNA testing, the Legislature passed the "Michael Morton Act" devoted to remedying the causes of wrongful convictions. *See* Act of May 16, 2013, 83rd Leg., R.S., ch. 49, 2013 Tex. Gen. Laws 106 (West). It is not plausible that the same legislative body would have intended to restrict access to postconviction DNA testing in a manner that would have denied Morton the DNA testing that proved his innocence.

[6] The purported "mountain of evidence" relied upon by the Majority misstates and/or omits critical evidence such as:

- The finding that "hair and fiber evidence, as well as other physical evidence, showed that Melissa had been in [Swearingen's] car and his home on the day of her disappearance" is inaccurate. Hair found in Mr. Swearingen's bed was *not* Ms. Trotter's, *Swearingen v. State*, 101 S.W.3d 89, 106 (Tex. Crim. App. 2003) (Johnson, J., dissenting).

- Contrary to the notion that Mr. Swearingen's wife observed "Melissa's cigarettes and lighter in [Swearingen's] house that evening," Majority Opinion, 2015 WL 6513883, at *1, DNA testing on the cigarette butt and on hair adhering to the Marlboro pack found at the home excluded Ms. Trotter (30 TR. at 136), and Mr. Swearingen's wife conceded that she smoked. (29 TR 179).

- The "discovery" of Ms. Trotter's papers near Mr. Swearingen's house, *see* Majority Opinion, 2015 WL 6513883, at *2, is problematic. A neighbor allegedly found these papers when retrieving a trashcan nearly a week *after* Mr. Swearingen was jailed. Two trash days had intervened, but on neither occasion did the neighbor see the 100 yard-long paper trail. (28 TR. at 134–41.).

*(cont'd)*

16

of matching DNA profiles on any (or all) of the evidence raised in this Case, including the rape kit, and untested fingernail scrapings and the existing foreign male profile found in Ms. Trotter's fingernails scrapings constitutes powerful evidence that this individual—not Mr. Swearingen—strangled (and raped,[7] if the rape kit results are included) the victim. And it is further undeniable that DNA technology has the proven capacity to actually identify the person whose DNA is found.

While courts have refused testing in circumstances where the testing would be thought merely to reveal the presence of an accomplice, the trial record does not reflect any evidence of an accomplice. *See Swearingen v. State*, 101 S.W.3d 89, 96 (Tex. Crim. App. 2003). In addition, matches to the already identified foreign male DNA would also eliminate the "contamination" theory that the State

---------------------

*(cont'd from previous page)*

- The microscopic match between the ligature and pantyhose from Mr. Swearingen's home, *see* Majority Opinion, 2015 WL 6513883, at *2, was based only on "visual comparison of tear lines"—testimony "reminiscent of bite-mark evidence" whose reliability has been widely criticized. Dissenting Opinion, 2015 WL 6513883, at *14 n.5 (Alcala, J.); *see* Comm. on Identifying the Needs of the Forensic Sciences Community, Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 175–76 (2009).

- The description of food found in Ms. Trotter's stomach was undermined by testimony from Dr. Stephen Pustilnik, Chief Medical Examiner for Galveston County who found nothing in autopsy photos of the stomach meeting the trial description. (2012 Hearing, Vol. 5 at 34–35.).

[7] At trial, the State sponsored testimony indicating that Ms. Trotter did not have a consensual intimate relationship within two weeks of her disappearance. (*See* 29 Tr. at 240). As a result, foreign male from a rape kit would thus be attributable only to a perpetrator.

17

advanced (and this Court has relied upon) to disregard the already-obtained exclusionary DNA. *Swearingen*, 424 S.W.3d 32, 39 (Tex. Crim. App. 2014); (*see also* App. Br. at 46–48.[8]) Perhaps most importantly, the Majority's tabulation of inculpatory evidence overlooks DNA testing already conducted on biological material found in certain fingernail scrapings from the victim—which suggests a struggle with *someone*—but which *excluded* Mr. Swearingen.[9] (Reply, FHD.29, at 1 n.1.) This, in addition to the fact that a pubic hair discovered at the autopsy was also determined not to be Mr. Swearingen's, (30 Tr. at 77–78), demonstrates that the record includes substantive evidence that a foreign male other than Mr. Swearingen was responsible for this crime. The additional exculpatory result of a match of any of these items to the cigarette butts would likewise place this suspect at the scene where Ms. Trotter's body was found—again contributing powerful evidence that the guilty party was the DNA source and not Mr. Swearingen. *See Criner*, No. 87-09-00591-CR-(1) (410th Dist. Ct., Montgomery County, Tex., July 28, 2000).

---

[8] The State's 2014 Appeal brief in Appeal No. AP-77,043 is referred to herein as "App. Br."

[9] At trial, the State offered a variety of dubious explanations for this foreign male DNA, including that: (1) blood came from an officer present at autopsy who cut himself shaving (28 Tr. at 124-25), (2) a fleck of blood circulating through the morgue's air conditioning system somehow landed in the scrapings from Ms. Trotter's fingernails (29 Tr. at 115-16), or winds at the crime scene or the whir of helicopters involved in the search miraculously blew blood from investigators under Ms. Trotter's fingernails (State's Response in Opposition to Defendant's Motion for Forensic DNA Testing, at 6.).

Since this Court agrees that, under an appropriate construction of article 64.03(a)(2)(A), exculpatory DNA results would create at least a 51% chance that a reasonable juror would find that an assault by another suspect created reasonable doubt as to Mr. Swearingen's guilt, the Majority's decision should be reheard and the District Court's grant of DNA testing should be affirmed.

## CONCLUSION AND PRAYER

Appellant respectfully prays that this Honorable Court grant his Petition for Rehearing, set this case for oral argument, and reverse the decision of the Majority of the Court of Appeals, thereby affirming the District Court's grant of DNA testing.

Respectfully Submitted,

    /s/ Bryce Benjet
BRYCE BENJET
Tex. Bar. No. 24006829
The Innocence Project
40 Worth Street, Suite 701
New York, New York 10013

JAMES G. RYTTING
Philip Hilder
Hilder & Associates, P.C.
819 Lovett Boulevard
Houston, Texas 77006

Counsel for Appellee

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

I hereby certify that this document complies with the requirements of Tex. R. App. Proc. 9.4(i). As calculated by Microsoft Word, there are 4,449 words in this document, excluding the portions excepted from the word count by the Rules.

    /s/ Bryce Benjet
BRYCE BENJET

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent by electronic mail to counsel for the Appellant, at their usual e-mail addresses, on the date of the submission of the original to the Clerk of this Court.

    /s/ Bryce Benjet
BRYCE BENJET



EXHIBIT A

2015 WL 6513883
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Criminal Appeals of Texas.

The State of Texas
v.
Larry Ray Swearingen, Appellee

NOS. AP–77,043 & AP–77,044 | DELIVERED:
October 28, 2015

**Synopsis**
**Background:** Capital defendant, whose murder
conviction and death penalty were affirmed on direct
appeal, 101 S.W.3d 89, filed his third motion for
postconviction forensic DNA testing. The 9th District
Court, Montgomery County, J., denied motion. The Court
of Criminal Appeals, Hervey, J., 303 S.W.3d 728,
affirmed. Defendant thereafter filed a fourth motion for
DNA testing. The District Court granted defendant's
motion. The Court of Criminal Appeals reversed, 424
S.W.3d 32. Defendant thereafter filed a supplemental
request for DNA testing, a fifth motion in which he
requested postconviction DNA testing of evidence. The
District Court granted motion. State appealed.

**Holdings:** The Court of Criminal Appeals, Keasler, J.,
held that:

[1] defendant's fifth and most recent motion for DNA
testing of was precluded by operation of the law of the
case doctrine to extent defendant sought testing of
evidence previously considered in prior appeal;

[2] defendant was not entitled to DNA testing of rape kit
and hair evidence; and

[3] State could not appeal trial court's order that
conditionally granted defendant's motion for release of
evidence.

Reversed and remanded in part; remaining issue on appeal
dismissed.

Yeary, J., concurred in part and dissented in part and
filedopinion in which Newell, J., joined.

Alcala, J., filed dissenting opinion.

**ON DIRECT APPEAL IN CAUSE NO.
99–11–06435–CR, FROM THE 9TH DISTRICT
COURT, MONTGOMERY COUNTY**

**Attorneys and Law Firms**

Bryce E. Benjet, New York, NY, for Appellant.

William J. Delmore III, Assistant District Attorney,
Conroe, TX, Lisa C. McMinn, State's Attorney, Austin,
TX, for the State.

*OPINION*

KEASLER, J., delivered the opinion of the Court, in
which KELLER, P.J., MEYERS, JOHNSON, HERVEY,
and RICHARDSON, JJ., joined.

**\*1** The trial judge granted Larry Swearingen's request for
post-conviction DNA testing of several pieces of evidence
under Texas Code of Criminal Procedure Chapter 64. The
judge also conditionally granted Swearingen's motion to
release certain evidence for preliminary testing to
determine whether the evidence contained biological
material. Because we once again find that Swearingen
fails to satisfy Chapter 64's requirements, we reverse the
judge's order. We dismiss the State's appeal challenging
the conditional order.

**I. Facts and Procedural History**

After being found guilty of the 1998 capital murder of
eighteen-year-old Melissa Trotter, Swearingen was
sentenced to death on July 11, 2000. His conviction was
affirmed on direct appeal.[1] We have found the following
previous findings of fact surrounding the substantial
inculpatory evidence presented at Swearingen's trial
supported by the record:

　• On the evening of December 7, 1998, two of
　[Swearingen's] acquaintances, the Fosters, witnessed

a phone conversation in which [Swearingen] arranged for a lunch meeting with a girl at a library the following day, and [Swearingen] then told the Fosters that the girl was Melissa Trotter, a college student from Willis.

• Three witnesses saw [Swearingen] sitting with Melissa in the Montgomery College library between 11:30 a.m. and 1:30 p.m. the following day, December 8, 1998.

• Melissa's Biology teacher saw her leave the Montgomery College library with a male shortly after 1:30 p.m. that day.

• Melissa's car remained in the Montgomery College parking lot following her disappearance on December 8, 1998.

• At 2:05 p.m. on December 8, 1998, [Swearingen] called Sarah Searle and said that he was at lunch with a friend.

• Sometime around 3:00 p.m. on December 8, 1998, [Swearingen's] landlord saw [Swearingen's] truck leaving from behind his home.

• At 3:03 p.m. on December 8, 1998, [Swearingen] placed a cell phone call that utilized a cell tower near FM 1097 in Willis, Texas, which would be consistent with [Swearingen] driving from his home to the Sam Houston National Forest.

• [Swearingen's] wife testified that she found their home in disarray on the evening of December 8, 1998, but none of the Swearingens' property was missing.

• [Swearingen's] wife observed Melissa's cigarettes and lighter in [Swearingen's] house that evening, and those items were subsequently recovered from [Swearingen's] home during the investigation.

• Hair and fiber evidence, as well as other physical evidence, showed that Melissa had been in [Swearingen's] car and his home on the day of her disappearance.

• [Swearingen] filed a burglary report falsely claiming that he had been out of town and his home was broken into on the day of Melissa's disappearance.

• Between the time of Melissa's disappearance and [Swearingen's] arrest, [Swearingen] told two acquaintances on two different occasions that he

believed police would be after him.

• When the Fosters heard that Melissa Trotter was missing on December 9, 1998, they contacted [Swearingen], who claimed he did not remember the last name of the girl with whom he had met the day before.

**\*2** • When Mrs. Foster told [Swearingen] that she recalled him saying the last name was "Trotter," and that a girl named Melissa Trotter was now missing, the phone went dead.

• [Swearingen] led a Sheriff's deputy on a high speed chase.

• Following [Swearingen's] arrest, law enforcement authorities observed and photographed red marks on [Swearingen's] neck, cheek, and back.

• On December 17, 1998, two neighbors of [Swearingen's] mother and stepfather collected numerous pieces of torn paper from along their street, which turned out to be Melissa Trotter's class schedule and some health insurance paper work Melissa's father had given to her.

• Melissa's body was discovered in an area of the Sam Houston National Forest with which [Swearingen] would have been familiar from previous time spent there.

• Melissa's body showed signs of significant decomposition when it was discovered in the woods 25 days after her disappearance.

• The ligature found around Melissa's neck matched the remainder of a pair of pantyhose found within [Swearingen's] home.

• The Harris Country Chief Medical Examiner testified that during the digestive process, a person's stomach will usually not empty in less than two hours, and any food within the stomach at death will remain there.

• The contents of Melissa's stomach at the autopsy, which included what appeared to be chicken and a french fry-like form of potato, were consistent with the tater tots she had eaten at Montgomery College shortly before leaving with [Swearingen] and the Chicken McNuggets she and [Swearingen] had apparently purchased at the nearby McDonald's on the day of her disappearance.

• While in jail, [Swearingen] attempted to create an

exculpatory letter written in Spanish in which he claimed to be someone else who had knowledge of Melissa's murder.

• Within that letter, [Swearingen] detailed specifics of the offense that accurately corroborated the physical and medical evidence in the case.
• While in jail awaiting trial, [Swearingen] told a cell mate that he had committed the capital murder and his only objective was to escape the death penalty.[2]

[1]    *Swearingen v. State,* 101 S.W.3d 89 (Tex.Crim.App.2003).

[2]    *Swearingen v. State,* 303 S.W.3d 728, 737–38 (Tex.Crim.App.2010).

This is certainly not Swearingen's first foray in post-conviction DNA testing. He filed Chapter 64 motions in October 2004, May 2008, and January 2009. All were denied by the trial judge. In January 2013 he filed his fourth motion. The judge granted the request, but we reversed.[3] In May 2014, approximately three months after our opinion, Swearingen filed a supplemental request for testing—a fifth motion under Chapter 64. In it, he requested post-conviction DNA testing of several pieces of evidence. In the granting Swearingen's request, the judge found that (1) the evidence identified in Swearingen's motion exists, contains biological material, is in a condition suitable for DNA testing, and subject to sufficient chain of custody, (2) that identity was an issue in this case, and (3) it is probable that Swearingen would not be convicted if exculpatory results were obtained through testing. The order then directed DNA testing of all the requested pieces of evidence:

*3 1. "Fingernail scrapings from Ms. Trotter's left and right hands, Trial Exhibit # 219."

2. "The ligature used to strangle Ms. Trotter (torn pantyhose), Trial Exhibit # 169, and hair and other samples collected from ligature."

3. "The pantyhose comprising the other half of the ligature, Trial Exhibit # 175, and hair and other samples collected from pantyhose."

4. "Four (4) cigarette butts found near Ms. Trotter's body, not offered at trial."

5. "Items of Ms. Trotter's clothing as follows:

a. Ms. Trotters [sic] bra, Trial Exhibit # 163;

b. Ms. Trotter [sic] blue jeans, Trial Exhibit # 165;

c. Ms. Trotter's sweater, Trial Exhibit # 166;

d. Ms. Trotter's underwear, Trial Exhibit # 167; and

e. Ms. Trotter's black shirt (Not entered as an exhibit, but collected and bagged at autopsy);"

6. "Rape Kit"; and

7. "Hairs collected from body, gloves used to move Trotter's body, and hairbrush found near scene."

The judge's second order conditionally granted a Motion for Release of Evidence "if it is later determined that the proof of the existence of biological material is insufficient." The judge signed these orders without conducting any evidentiary hearing and a mere six months after we held that Chapter 64 did not entitle Swearingen to DNA testing of most of the same pieces of evidence.[4]

[3]    *State v. Swearingen,* 424 S.W.3d 32 (Tex.Crim.App.2014).

[4]    *Id.* at 35, 39.

## II. Analysis

[1] [2]Under Chapter 64, a "convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material."[5] But the convicting court can only order this testing if five requirements are met:

(1) "the court finds that the evidence still exists and is in a condition making DNA testing possible;"

(2) "the court finds that the evidence has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;"

(3) "the court finds that identity was or is an issue in the case;"

(4) "the convicted person establishes by

preponderance of the evidence that the person would not have been convicted if exculpatory results had been obtained through DNA testing;" and

(5) "the convicted person establishes by preponderance of the evidence that the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice."[6]

Chapter 64 motions are also subject to the "law of the case" doctrine.[7] According to that doctrine, "an appellate court's resolution of questions of law in a previous appeal are binding in subsequent appeals concerning the same issue."[8] Therefore, "when the facts and legal issues are virtually identical, they should be controlled by an appellate court's previous resolution."[9] Such a rule promotes "judicial consistency and efficiency."[10]

[5]     TEX. CODE CRIM. PROC. art. 64.01(a–1).

[6]     *Id.* art. 64.03(a).

[7]     *Swearingen,* 424 S.W.3d at 35–36.

[8]     *Id.*

[9]     *Id.*

[10]     *Id.*

## A. Order granting DNA testing under Chapter 64

[3]This Court has previously published opinions refusing Swearingen's Chapter 64 motions pertaining to the particular pieces of evidence (1) through (5) listed above.[11] Most recently, in 2014, we unanimously reversed this judge's granting Swearingen's prior Chapter 64 motion requesting DNA testing of that evidence. We held that under the "law of the case" doctrine, the judge erred when he granted testing of pieces of evidence (2) through (5).[12] We also held that Swearingen was not entitled to DNA testing of the fingernail scrapings because we were "not persuaded that results showing the presence of

another DNA donor in the fingernail scrapings would overcome the 'mountain of evidence' of [Swearingen's] guilt."[13] And in our 2010 unanimous opinion, we noted that the evidence of Swearingen's guilt was "overwhelming" and that "even if we were to grant [his] request to test all of the items proffered and those results were exculpatory, [he] cannot show by a preponderance of the evidence, or that there is a 51% chance, that he would not have been convicted."[14] We noted that the trial judge made "supported-by-the-record findings of fact that again, underscore the substantial evidence of guilt."[15] Because we find that the record does not contain any change in the law, facts, or circumstances since our 2014 opinion and the granting of Swearingen's latest Chapter 64 motion, we see no reason to revisit our previous holdings on the matter. We hold that the judge erred in granting the DNA testing request of the items listed as (1) through (5) above.

[11]     *Swearingen,* 424 S.W.3d at 32; *Swearingen,* 303 S.W.3d at 737–38.

[12]     *Swearingen,* 424 S.W.3d at 38 ("Since we have previously held that, as a matter of law, the appellee had not met his burden of proof as to the existence of biological material, and because the legislature's amendment did not alter this result except in the case of the fingernail scrapings, the trial court erred under the law of the case doctrine when it disregarded our previous holding. The appellee is not entitled to testing of the ligature, the victim's clothing, or the cigarette butts.").

[13]     *Id.* at 38–39 ("Primarily, this is because the victim's having encountered another person would not factually exclude [Swearingen] from having killed her. There are many ways someone else's DNA could have ended up in the victim's fingernails. Such results would not require an inference that [Swearingen] would [have] been acquitted.").

[14]     *Swearingen,* 303 S.W.3d at 736.

[15]     *Id.* at 737.

*4 [4]The judge, however, found our 2010 holdings inapplicable in that "Swearingen's current request includes additional probative evidence such as the rape

kit, hair evidence and cigarette butts." Including cigarette butts as a distinguishing factor is clearly wrong. Swearingen sought testing of the cigarette butts in 2010 and 2014. To the extent the rape kit and hair evidence present entirely new requests, they do not prove that this current request should be resolved any differently than in our 2010 and 2014 conclusions. Swearingen is still unable to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing.[16]

[16]     See TEX.CODE CRIM. PROC. art. 64.03(a)(2)(A).

The judge's determination that Swearingen satisfied this requirement rests largely on two theories:

(1) "these results would both rule out an innocent explanation for the presence of the foreign DNA and would likewise provide support for Swearingen's contention that the pantyhose found outside his home was planted"; and

(2) "Swearingen pointed to several alternative suspects as well as known killers active in the area at the time. There would be no innocent explanation for finding the DNA of an alternative suspect or known killer on or in the victim or at the crime scene.... The strength of this [new-found] evidence [of a known killer's involvement] would be greatly increased if subsequent investigation of that individual produced additional evidence of guilt such as a confession or a false denial of contact with the victim or the scene."

The judge's order does not take into consideration what we referred to in our 2010 and 2014 opinions as the "mountain of inculpatory evidence" Swearingen faced at trial. In fact, the current judge's discussion of the relevance of potential results omits the most inculpatory pieces of evidence admitted against Swearingen. Further, the judge's findings are entirely speculative, especially when considered in the context of all the admitted evidence. We faulted Swearingen in 2014 for attempting to rely on the ramifications of hypothetical matches from evidence that eviscerate Chapter 64's requirements.[17] And it is even more attenuated to assume hypothetical confessions and false denials of contact stemming from hypothetical DNA matches. Once again, Swearingen cannot establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing. For the foregoing reasons, we vacate the order granting Chapter 64 testing.

[17]     See Swearingen, 424 S.W.3d at 39 ("A requirement to assume that the results of testing were not only from someone other than the convicted person but that the other person was a repeat offender ... makes it hard to imagine a case in which we would not grant DNA testing. Such compelling DNA results would certainly overcome any mountain of inculpatory evidence. We believe that had the legislature meant to so drastically lower the barrier for Chapter 64 testing, they would have said so explicitly.")

**B. Conditional order granting the release of evidence for preliminary testing**

[5]The judge's second order dismissed as moot Swearingen's Motion for Release of Evidence because he had granted Swearingen's requested Chapter 64 DNA testing. The order continued nonetheless and purportedly granted the motion in the alternative. It is this language that forms the basis of the State's separate appeal:

However, the Court finds that, pursuant to the amended Article 64.01(a), that the defendant would have the right to demonstrate the presence of "identifiable" biological material which "may be suitable" for testing. Accordingly, this Court would GRANT the motion in the alternative if it is later determined that the proof of the existence of biological material is insufficient.

**\*5** ....

... [I]f the evidence of the existence of biological material pursuant to Article 64.01(a) is subsequently determined to be insufficient, the Motion [for Release] is GRANTED.

However, the State is unable to appeal this conditional order. The State claims that it may, citing Article 44.01 because the order was "issued under Chapter 64,"[18] and Article 64.05's broad phrase allowing "appeals under this chapter."[19] While resolving the issue here would perhaps "provide an orderly and expeditious means for review of a potentially unauthorized order,"[20] we hold the State cannot contest the order's validity by way of appeal. The conditional order appears to be effective, if at all, in the event that this Court holds that Swearingen was not entitled to Chapter 64 testing. In other words, the conditional order rests on grounds outside the bounds of Chapter 64.

[18]     TEX.CODE CRIM. PROC. art. 44.01(a)(6) ("The state is entitled to appeal an order of a court in a criminal case if the order: ... (6) is issued under Chapter 64").

[19]     *Id.* art. 64.05 ("An appeal under this chapter is to ... [the court of criminal appeals] if the convicted person was convicted in a capital case and was sentenced to death....").

[20]     State's Brief at 5.

In *State v. Patrick,* a plurality of this Court held that the State could not appeal a judge's order granting testing that did not purport to be based on Chapter 64.[21] The *Patrick* plurality held that the proper avenue to contest the order was through a writ of mandamus, which it conditionally granted, holding the judge was "clearly and indisputably without jurisdiction to issue the order in question."[22] The plurality held that a trial court does not possess any inherent powers extending beyond the powers granted to it under Chapter 64 that would permit it from granting preliminary testing.[23] Unlike *Patrick,* the State does not seek mandamus relief along side its appeal. Accordingly, we must dismiss this State's appeal.

[21]     *State v. Patrick,* 86 S.W.3d 592, 594 (Tex.Crim.App.2002).

[22]     *Id.* at 594–95

[23]     *Id.* at 596 ("Any inherent powers possessed by the trial court as a result of its jurisdiction under Chapter 64 would necessarily be limited by Chapter 64.").

### III. Conclusion

For the foregoing reasons, in cause number AP–77,043, we reverse the judge's order granting DNA testing under Chapter 64 and remand for proceedings in accordance with this opinion. In cause number AP–77,044, we dismiss the State's appeal challenging the judge's order conditionally granting the release of evidence.

YEARY and NEWELL , JJ., join Part IIB of the opinion.

YEARY , J., filed a concurring and dissenting opinion, in which NEWELL, J, joined.

ALCALA , J., filed a dissenting opinion.

### *CONCURRING AND DISSENTING OPINION*

YEARY, J., filed a concurring and dissenting opinion in which NEWELL, J., joined.

### I.

I join Part II.B. of the Court's opinion disposing of cause number AP–77,044.

### II.

I write separately to express why I believe the Court ought to affirm the trial court's order granting DNA testing, in cause number AP–77,043, at least in part.

### A. The Ligature, Cigarette Butts, and Victim's Clothing

With respect to much of the evidence that the convicting court has now ordered that testing be done (victim's clothing, cigarette butts, ligature), we have already held—in some cases, twice—that Appellee failed to show the existence of biological materials on these particular items. *State v. Swearingen,* 424 S.W.3d 32, 37–38 (Tex.Crim.App.2014); *Swearingen v. State,* 303 S.W.3d 728, 732–33 (Tex.Crim.App.2010). Finding no "change in the law, facts, or circumstances since our 2014 opinion[,]"Majority Opinion at ——, the Court continues to reject Appellee's request to test those items for the same reason. Judge Alcala believes that there *has* been a change in the facts that would preclude applicability of the law of the case doctrine, namely, DNA analyst Huma Nasir's revised opinion. Dissenting Opinion at —— –——. Nasir now explains that, when she said "likely" in her earlier affidavit, she actually meant "at least more likely than not[.]" *Id.* at ——. She then somehow translates "more likely than not" into "a reasonable degree

of scientific *certainty* that biological material *is present* [.]" *Id.*(emphasis supplied.) In *State v. Swearingen,* we made it clear as a matter of law that "merely probable" is not sufficient. 424 S.W.3d at 38. In common parlance, "more likely than not" is the same as "probable." I cannot blame the Court for rejecting the notion that "probable" may reasonably be regarded as equating with "a reasonable degree of scientific certainty." Like the Court, I see no change in the law or facts to preclude our application of the law of the case doctrine. Majority Opinion at ——.

### B. Fingernail Scrapings, Rape Kit, and Hairs

**\*6** With respect to the fingernail scrapings, the Court today also relies on the law of the case doctrine, but this time to hold that Appellee cannot establish a *different* prerequisite to DNA testing. Majority Opinion at —— – ——. In *State v. Swearingen,* we held that, even assuming such testing would turn up DNA from a third party, not Appellee's, such exculpatory evidence would not "overcome the 'mountain of evidence' of [Appellee's] guilt." 424 S.W.3d at 38 (quoting *Swearingen v. State,* 303 S.W.3d at 736). Hence, he cannot establish by a preponderance of the evidence that he would not have been convicted had the fingernail scrapings contained a third party's DNA. The Court reiterates that holding today.

Beyond this, however, the Court today does not purport to rely on the law of the case doctrine. Regarding Appellee's request for DNA testing of several new items, namely, the rape kit and certain hairs, the Court seems willing to assume that these do contain biological material and does not reject Appellee's request for testing on that account. Instead, in an altogether new holding, the Court concludes that, as with new DNA testing of the fingernail scrapings, current testing of the rape kit and hairs, even if it revealed third-party DNA, would not serve to refute the "mountain of evidence" pointing to Appellee's guilt. "Once again," the Court concludes, in an original holding that does not rely upon law of the case, Appellee "cannot establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing." Majority Opinion at ——.

I agree with Judge Alcala that both the hair and the rape kit contain biological material in contemplation of Article 64.01(a)(1). TEX.CODE CRIM. PROC. art. 64.01(a)(1). Dissenting Opinion at —— – ——. "Hair" is expressly listed in the statute as it presently reads, and a rape kit will inevitably contain, if not "semen," then at least some

type of "bodily fluid," even if only the victim's. But in making any assessment as to whether exculpatory DNA results would likely change a jury's verdict, the Court should measure the "mountain of evidence" inculpating Appellee against presumptively favorable test results for *all* of the evidence for which biological material has been shown to be present: the rape kit, the hairs, *and the fingernail scrapings*. The Court should not rely on law of the case in this piecemeal fashion to first reject DNA testing of the fingernail scrapings, and then later to reject DNA testing of the rape kit and hairs without factoring in the fingernail scrapings. Instead, I would have the Court measure the mountain of evidence against the exculpatory inferences that would flow from DNA testing that would presumptively show third party DNA on *all three* of these sources, considered together.

I am not unmindful of decisions from this Court that have refused DNA testing under circumstances in which such testing might reveal no more than the presence of an *accomplice* without also ruling out the defendant's participation as either principal actor or party. *See, e.g., Wilson v. State,* 185 S.W.3d 481, 485 (Tex.Crim.App.2006) ("[I]f new, more discriminating DNA testing showed that another perpetrator was involved, that finding would not exonerate appellant because it would show nothing more than there was another party to the crime, at best."). But, I believe that if DNA testing all three of these items had demonstrated third-party DNA—and especially had it revealed the presence of DNA from the *same* third party in all three of these items, and none of Appellee's DNA—some rational juror might readily have harbored a reasonable doubt with respect to whether Appellee had any role in Trotter's abduction, sexual assault, and murder.[1] *Cf. Routier v. State,* 273 S.W.3d 241, 259 (Tex.Crim.App.2008) ("In our estimation, DNA evidence showing that an unknown intruder—indeed, the same unknown intruder—had left blood on the night shirt and the door from the utility room to the garage, along with a facial hair and a pubic hair, would more likely than not have caused the jury to harbor a reasonable doubt as to the appellant's guilt and decline to convict her."). At the very least, we should defer to the convicting court's judgment to that effect.

---

[1]     Applicant is entitled to DNA testing if he can demonstrate "by a preponderance of the evidence" that, among other things, "he would not have been convicted if exculpatory results had been obtained" through that testing. TEX.CODE CRIM. PROC. art. 64.03(a)(2)(A). If at least one rational juror would likely have harbored a reasonable doubt, Applicant would not have been convicted.

**\*7** For these reasons, I ultimately dissent to the Court's disposition of cause number AP–77,043.

### DISSENTING OPINION

ALCALA, J., dissenting.

This is a close case with greatly important competing interests. On the one hand, this brutal crime against a young college student, Melissa Trotter, occurred almost twenty years ago, and the evidence establishing her killer's guilt should have been finally resolved by now. On the other hand, for about a decade, Larry Ray Swearingen, appellee, has been seeking DNA testing on items that he claims would exonerate him of this offense for which he was convicted. Swearingen's current motion includes first-time requests for DNA testing on hair evidence and the sexual assault evidence-collection kit from the victim (rape kit), which are by definition biological material under the applicable statute. I conclude that, despite the volume of incriminating evidence of Swearingen's guilt, DNA testing on the hair evidence and the rape kit linking a different person to this offense would, by a preponderance of the evidence, show that Swearingen would not have been convicted. I, therefore, respectfully dissent from this Court's judgment that, for the third time in over a decade, denies Swearingen access to DNA testing under Chapter 64 of the Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. arts. 64.01, 64.03. I would accordingly uphold the trial court's order granting DNA testing of these items. With respect to the other items, I concur in this Court's judgment denying the testing.

### I. Background

Since he was convicted and sentenced to death for the rape and murder of Melissa Trotter, Swearingen has filed multiple motions for DNA testing, each of which has been rejected by this Court.[1] Acknowledging that he filed a motion in 2004 that was denied by the trial court and later dismissed by this Court on appeal due to procedural default, I focus on his 2008 motion that this Court addressed in *Swearingen I;* his 2013 motion initially addressed in *Swearingen II;* and his supplement to the 2013 motion that was filed after our remand to the trial court in *Swearingen II,* which is the subject of this Court's instant opinion that I will refer to as *Swearingen*

*III.*[2] At issue in this case are Swearingen's requests for DNA testing on (1) the ligature that was used to kill the victim, consisting of one half of a pair of pantyhose, (2) the other half of the pair of pantyhose found in Swearingen's trailer, (3) hairs found on and near the body, (4) the rape kit, (5) the fingernail scrapings, (6) the cigarette butts found near the victim's body, and (7) the victim's clothing. For consistency, I refer to these items using the above assigned numbers throughout the opinion.

[1] There is a disagreement about the number of Chapter 64 motions Swearingen has filed. By my reading of the record, Swearingen has filed three motions. The trial court denied his first motion, the 2004 motion, and this Court dismissed his appeal of the trial court's ruling based on procedural default. In *Swearingen I,* this Court addressed his second motion, the 2008 motion, and its supplement that had been filed by him. In *Swearingen II,* this Court addressed his third motion, the 2013 motion. Here, in *Swearingen III,* we again address his third motion and its supplement that appears here after our remand in *Swearingen II.*

[2] Swearingen filed a motion for DNA testing in 2004, which the trial court denied in 2005. Because he did not timely appeal the trial court's order, this Court rejected his appeal due to procedural default. *State v. Swearingen,* 189 S.W.3d 779 (Tex.Crim.App.2006). This Court, therefore, never reached the merits of his first motion for DNA testing.

### A. The 2008 Motion Discussed in *Swearingen I*

**\*8** In May 2008, Swearingen filed a Chapter 64 motion for DNA testing, and he updated the motion in January 2009. After the trial court denied that motion, this Court affirmed the trial court's ruling. *Swearingen v. State,* 303 S.W.3d 728 (Tex.Crim.App.2010) (*Swearingen I* ). This motion requested the testing of materials that Swearingen had not sought to be tested previously: (1) the ligature; (5) the victim's fingernail scrapings, including (5–a) scrapings from under the left-hand fingernails that were shown to contain blood flakes and (5–b) other scrapings from under the left-and right-hand fingernails, consisting of a "black flaky matter" and traces of sand or gravel; (7) the victim's clothing, including scrapings from her ripped jeans; and (8) a foreign pubic hair that was recovered during the collection of the rape kit. *Id.* at 730.

The trial court denied the requests for DNA tests of (1) the ligature, (5–b) the other fingernail scrapings, and (7)

the clothing because there had been no showing that these items contained biological material. *Id.* On appeal from the trial court's denial of the motion for DNA testing, this Court noted that the then-existing statute required a movant to show that each of these items actually contained biological material. *Id.* at 733. This Court held that, with respect to those items, "the record [was] void of any concrete evidence that biological material existed on the evidence sought to be tested." *Id.*

The trial court's order also denied testing of (5–a) the victim's left-hand fingernail scrapings that contained blood flakes. *Id.* at 735. In upholding the trial court's ruling as to this evidence, this Court observed that the blood flakes had already been tested, and the results of that testing had revealed a full male DNA profile that was inconsistent with the DNA profile of Swearingen, the complainant, or any other known DNA profile. *Id.* Although the initial test was not done with the most recent technique, this Court reasoned that Swearingen was not entitled to retesting of this evidence because the previous test had already produced accurate, probative results in the form of a full male DNA profile that had been submitted to CODIS without a match. *Id.* This Court, therefore, concluded that Swearingen had failed to show "a reasonable likelihood that results of re-testing would be more accurate or probative." *Id.*

The trial court additionally denied the request for testing of the foreign pubic hair that was recovered during the collection of the rape kit because the pubic hair could not be found and a chain of custody could not be established. This Court upheld this ruling because the hair was not available for testing. *Id.*[3]

[3]     Swearingen's present motion does not request DNA testing on (8) the foreign pubic hair that this Court determined in *Swearingen I* had been lost, and, therefore, I do not discuss that item any further in this opinion.

This Court also upheld the trial court's determination that Swearingen had filed the Chapter 64 motion to unreasonably delay his execution. *Id.* at 736. Furthermore, the Court detailed, in twenty-five bullet points, the evidence supporting its conclusion that, even if the DNA test results were favorable as to the items that had been requested for testing in that motion, Swearingen was unable to show by a preponderance of the evidence that he would not have been convicted. *Id.* at 736–38.

**B. The Third Motion Addressed in *Swearingen II***

In response to the Legislature's amendment of Chapter 64 in 2011, Swearingen filed another motion seeking DNA testing in 2013. His motion sought to have DNA testing performed on several pieces of evidence: (1) the ligature, (2) the other leg of pantyhose, (5) the fingernail scrapings, (6) the cigarette butts, and (7) the victim's clothing. In support of his motion, Swearingen attached an affidavit, dated January 2013, by Huma Nasir, a forensics supervisor at Orchid Cellmark, Inc. The State responded that the doctrine on the law of the case applied and, on that basis, it argued that Swearingen's motion for DNA testing should be rejected.

**\*9** The trial court granted the motion in June 2013, thereby ordering DNA testing to proceed, and it made findings of fact and conclusions of law supporting that order. After the State appealed, this Court reversed the trial court's order. *State v. Swearingen,* 424 S.W.3d 32 (Tex.Crim.App.2014) ( *Swearingen II* ). This Court explained that it had reviewed the requests discussed in *Swearingen I* with respect to (1) the ligature, (5) the fingernail scrapings, and (7) the victim's clothes. *Id.* at 36. This Court stated, "Although the law has been amended, these amendments did not affect all of our previous determinations. In the instances where the amendment did not impact our analysis, the trial court erred by failing to adhere to our previous determinations." *Id.*

This Court noted that, since Swearingen's previous round of DNA requests, the Legislature's amendments changed Chapter 64 in two major ways. *Id.* First, the Legislature added a definition of "biological material," which specifies that certain items, such as fingernail scrapings, are per se biological material. *Id.* at 37. Second, the Legislature eliminated a requirement that the lack of previous testing had not been the convicted person's fault. *Id.* In examining the meaning of these amendments, this Court initially observed, as it had in *Swearingen I,* that a movant for DNA testing is required to demonstrate that the evidence contains biological material. *Id.* The Court further said, "No part of the amendments addresses a method for determining the existence of biological material." *Id.* The Court expressly noted that Swearingen had the burden to "prove biological material exists and not that [its existence] is merely probable." *Id.* at 38.

As to the particular items that Swearingen sought to be tested, this Court held that he had failed to show the existence of biological material in the case of (1) the ligature, (2) the pantyhose, (6) the cigarette butts, and (7) the victim's clothing. *Id.* This Court reasoned that, although Swearingen had presented Nasir's affidavit

indicating that touch DNA would "likely" be contained on those items, a mere probability of the existence of biological material was inadequate to satisfy his burden under the statute. *Id.* at 38. In light of the absence of new evidence in *Swearingen II* that would show that these items contained biological material, this Court reached the same conclusion as in *Swearingen I*, in which this Court had held that the lack of evidence of biological material required Swearingen's motion to be rejected. *See id.* at 37–38; *Swearingen I,* 303 S.W.3d at 733. This Court determined that the law-of-the-case doctrine applied, and it was bound to its former analysis and ruling denying the testing as to these particular items. *Swearingen II,* 424 S.W.3d at 37–38.

As to (5) the fingernail scrapings, this Court held that the law-of-the-case doctrine did not apply because the amended statute defined fingernail scrapings as biological material per se, and, therefore, Swearingen did not need to show that they contained biological material. *Id.* at 38. Nonetheless, this Court ruled that Swearingen was not entitled to DNA testing as to the fingernail scrapings. *Id.* at 38–39. It reasoned that, even if exculpatory results were obtained, "the victim's having encountered another person would not factually exclude [Swearingen] from having killed her," in light of the fact that "[t]here are many ways someone else's DNA could have ended up in the victim's fingernails." *Id.* It further observed that the jury was already aware that an unidentified male's DNA was found under the victim's fingernails, and, therefore, any additional similar exculpatory results would not have likely changed the jury's verdict in light of the "mountain of evidence" showing Swearingen's guilt. *Id.* at 39 ("If the jury already knew of exculpatory results obtained from under the victim's nails and disregarded them, we have no reason to believe that it would be any different with regards to the remainder of the fingernail scrapings."). This Court reversed and remanded for proceedings in accordance with its opinion.[4] *Id.*

---

[4]   Our remand in *Swearingen II* was for proceedings in accordance with the opinion, and the purpose of the remand is unclear. Swearingen asserts that the remand was to permit him the opportunity to obtain a revised affidavit from the expert and to submit new requests for testing. The State understands the remand to have been for the trial court to enter an order denying the motion for DNA testing and setting an execution date. It would have been unnecessary either (1) to remand the case for a denial order because that would be done through rendition of a judgment by this Court, or (2) to remand for the setting of an execution date, which is unrelated to a DNA motion. Swearingen's theory thus presents the only plausible rationale for this Court's remand order.

## C. This Court's Instant Majority Opinion: After Remand from *Swearingen II*

**\*10** After this Court's remand order, Swearingen supplemented his motion by requesting DNA testing on items that he had previously requested to have tested, and he additionally sought DNA testing on certain items for the first time. He explained that "each item was either not previously tested or can now be tested with much more sensitive technology that will produce more robust results." Specifically, the first-time requests are for testing of (3) the hairs, including hair recovered from the victim's body and clothing, hairs on the ligature and pantyhose, hair recovered from gloves used to move the body, and hair recovered from a hairbrush found near the victim's body, and (4) the rape kit. In response, the State argued that the law-of-the-case doctrine should apply to this case in its entirety.

## II. The Doctrine on the Law of the Case is Inapplicable to the Requests for DNA Testing on (2) the Pantyhose, (3) the Hair Evidence, (4) the Rape Kit, and (6) the Cigarette Butts

The doctrine on the law of the case is inapplicable to four of Swearingen's requests. Swearingen now presents additional evidence in support of his claim that (2) the pantyhose and (6) the cigarette butts contain biological material, and he includes first-time requests for testing on (3) the hair evidence and (4) the rape kit, neither of which was before this Court in *Swearingen I* or *Swearingen II.* Because the facts are not virtually identical, the law-of-the-case doctrine is inapplicable to these requests.

The law-of-the-case doctrine is designed to promote consistency and efficiency so that trial courts may rely upon the holdings of reviewing courts. *Carroll v. State,* 101 S.W.3d 454, 461 n. 35 (Tex.Crim.App.2003). It is only applicable if "the facts and legal issues are virtually identical ... [so that] they should be controlled by an appellate court's previous resolution." *Swearingen II,* 424 S.W.3d at 36. For the law-of-the-case doctrine to control this case, the evidence would have to show that the applicable DNA statute, the items sought to tested, and the evidence relevant to the motion are virtually identical. *See id.*

Here, the applicable DNA statute permits a convicted person to "submit to the convicting court a motion for forensic DNA testing of evidence containing biological material." TEX.CODE CRIM. PROC. art. 64.01(a–1). This motion may request testing of evidence that was secured in relation to the offense comprising the underlying conviction and was in the possession of the State during the trial but either was not previously tested or, although previously tested, can be tested with newer techniques which can provide more accurate and probative results. *Id.* A convicting court may order testing if the evidence in question (1) still exists and is in a condition making DNA testing possible; (2) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; and (3) identity was or is an issue in the case. *Id.*art. 64.03(a)(1). Further, the convicted person has the burden of showing by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing" and that the request for testing is not made to unreasonably delay the execution of sentence. *Id.*art. 64.03(a)(2).

Swearingen's present motion for DNA testing includes requests for testing of the following items: (A)(1) the ligature, (2) the pantyhose, (6) the cigarette butts, and (7) the victim's clothing; (B)(3) the recovered hair samples; and (C)(4) the rape kit. Swearingen also requests testing of (5) the fingernail scrapings, which I discuss in Section D. Section D addresses the State's theory that the doctrine on the law of the case broadly applies to bar DNA testing in this case because of this Court's characterization in *Swearingen I* and *Swearingen II* that there is a mountain of evidence that shows Swearingen's guilt for this offense.

### A. (1) The Ligature, (2) The Pantyhose, (6) The Cigarette Butts, and (7) The Victim's Clothing

**\*11** In *Swearingen II,* this Court held that Swearingen had failed to provide evidence to show that there would be DNA on (1) the ligature, (2) the pantyhose, (6) the cigarette butts, and (7) the victim's clothing, and, here, he requests DNA testing as to the same items. *Swearingen II,* 424 S.W.3d at 38. This time, however, he has produced a new affidavit from his DNA expert, Huma Nasir, in which she reports that biological material is present on these items. She states, "It is my opinion to a reasonable degree of scientific certainty that biological material is present on [ (1) the ligature, (2) the pantyhose, (6) the cigarette butts, and (7) the victim's clothing]." No affidavit from Nasir was presented in *Swearingen I.* And

Nasir's former affidavit in *Swearingen II* more equivocally stated,

> Thus the pantyhose was probably handled by the assailant with some force and likely contains his biological material that is suitable for DNA testing.... Biological material from any wearer of this pantyhose and anyone who tore the pantyhose is likely to be detected on this item using modern DNA testing.... Where there has been such obvious and forceful contact with the victim's clothing, the biological material of the victim and the perpetrator is likely to be deposited on the clothing.... Because cigarettes are both manually handled and placed in a person's mouth, skin cells and epithelial cells from saliva were likely deposited on the cigarettes, rendering them suitable for DNA analysis....

Upon Swearingen's request after this Court's remand in *Swearingen II,* Nasir supplemented her affidavit to more clearly articulate her scientific position that we now consider in the instant case. The new affidavit states,

> In my prior affidavit, I discussed the concept of "touch DNA" and explained that DNA profiles can be obtained from microscopic amounts of skin cells left by a person who has touched or handled an object. I provided my expert opinion that the objects identified in this case would "likely" contain biological material suitable for testing. By "likely," I meant that it is at least more likely than not that evidence in this case would contain biological material.... I have now been asked to provide a more precise opinion regarding the scientific likelihood that biological material is present on the objects identified for testing in this case.... It is my opinion to a reasonable degree of scientific certainty that biological material is present on the items....

Because the facts before us are different in light of the new evidence of the presence of biological material based on a never before considered affidavit, the law-of-the-case doctrine ordinarily would be inapplicable in the resolution of this matter. Here, however, as I explain in Section D below, the doctrine controls this case with respect to (1) the ligature and (7) the clothing because this Court's analysis in *Swearingen I* held that, even if exculpatory results were obtained as to those items, that evidence would not overcome the weight of the evidence establishing Swearingen's guilt. As to (2) the pantyhose and (6) the cigarette butts, I conclude, as explained in Section D below, that those items are not controlled by the doctrine on the law of the case.

### B. (3) The Hair Evidence

The DNA testing on the hair evidence requested in the instant proceedings was never before requested in the motions discussed in *Swearingen I* or *Swearingen II,* or in any other motion for DNA testing. In his supplemented Chapter 64 motion, Swearingen requests testing of certain hair collected from the victim's clothing, hair recovered from the victim's body, and hair recovered from a hairbrush found near the victim's body. These are entirely new requests that we have not previously ruled upon, so the doctrine on the law of the case does not govern our disposition of his motion for testing as to these pieces of evidence. The State contends that none of this hair is in an appropriate condition for testing because it has not been determined that the roots are intact. However, Nasir's affidavit states, "Mitochondrial DNA testing can also be conducted on the shaft of the hair(s) without roots. Although mitochondrial DNA profiles are not CODIS eligible, results can be used for exclusion purposes and to compare against known samples."

**\*12** Further, the Legislature's 2011 amendments to Chapter 64 included a definition of biological material. The statute was amended to define biological material as follows: "(a) In this section, 'biological material': (1) means an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing; and (2) includes the contents of a sexual assault evidence collection kit." TEX.CODE CRIM. PROC. art. 64.01(a). The previous version of the statute did not define the term biological material. According to the amended statute, the hairs collected are, by definition, biological material, so Swearingen has met his burden of proof as to the hairs. I would hold that the law-of-the-case doctrine is inapplicable to the instant

requests for DNA testing on (3) the hairs.

### C. (4) The Rape Kit

Swearingen did not request DNA testing of the rape kit in *Swearingen I* or *Swearingen II,* or in any other motion for DNA testing. The law of the case, therefore, cannot apply to his request for testing as to that item. Surprisingly, it appears that the rape kit has never been tested at all. The rape kit apparently was not tested because the Texas Department of Public Safety reported that no semen was detected. However, Nasir's affidavit states that the rape kit should still be tested. She states, "I am aware of a number of cases in which a lab failed to detect semen but a foreign DNA profile was detected nonetheless. This may be due to levels of semen too low to be detected by the methodology employed, poor laboratory testing processes, or foreign DNA from biological material other than spermatazoa (such as epithelial cells)." The capabilities for DNA testing from fifteen years ago have changed considerably as compared to what is scientifically possible today. Further, like the hair evidence, the rape kit is biological material according to the statutory definition. So, the law-of-the-case doctrine cannot apply to the rape kit, at least regarding the requirement that Swearingen must prove the existence of biological material. I would hold that the law-of-the-case doctrine is inapplicable to the instant request for DNA testing on (4) the rape kit.

### D. Applicability of the Law–of–the–Case Doctrine to Certain Items

It is a fallacy to suggest that, because this Court, in *Swearingen I* and *Swearingen II,* referred to the evidence of guilt in this case as constituting a mountain of evidence when comparing it to Swearingen's requests for DNA testing of certain items, namely (1) the ligature, (5) the fingernail scrapings, and (7) the victim's clothing, the same analysis of the evidence must identically apply to the requests for DNA testing on (2) the pantyhose, (3) the hairs, (4) the rape kit, and (6) the cigarette butts. I conclude, as explained below, that the law-of-the-case doctrine is inapplicable to the requests for DNA testing on (2) the pantyhose, (3) the hairs, (4) the rape kit, and (6) the cigarette butts because this Court has never weighed the probative value of favorable findings from that testing against the weight of the incriminating evidence establishing Swearingen's guilt.

In *Swearingen I,* we held that the mountain of evidence

was so large that "even if we were to grant [Swearingen's] request to test all of the items proffered [he] cannot show by a preponderance of the evidence, or that there is a 51% chance, that he would not have been convicted." *Swearingen I,* 303 S.W.3d at 736. That analysis pertained to (1) the ligature, (5) the fingernail scrapings, and (7) the victim's clothing. Because this Court in *Swearingen I* has already weighed the exculpatory value of favorable DNA evidence that might be obtained from those items, this Court today is bound by the law-of-the-case as to those items.

**\*13** Our ruling in *Swearingen II* assessed only the probative value of exculpatory fingernail scrapings, and therefore, our analysis on the comparative weight of that evidence against the evidence of Swearingen's guilt is limited to that item. There, we said, "We are not persuaded that results showing the presence of another DNA donor in the fingernail scrapings would overcome the 'mountain of evidence' of the appellee's guilt."

*Swearingen II,* 424 S.W.3d at 38. We ruled this way because only the fingernail scrapings were left after we disposed of the other evidence under the law-of-the-case doctrine.

Unlike the items in *Swearingen I* and *Swearingen II,* this Court has never weighed the evidence of Swearingen's guilt against any exculpatory DNA evidence that might be obtained from testing on (2) the pantyhose, (3) the hairs, (4) the rape kit, or (6) the cigarette butts. The law-of-the-case doctrine, therefore, is inapplicable as to those items.

The following chart visually demonstrates my conclusions with respect to the items to which the law-of-the-case doctrine applies and those to which it does not apply:

| Requested Items for DNA Testing | *Swearingen I* 2008/2009 Motion | *Swearingen II* 2013 Motion | Current 2013 Motion on Remand |
|---|---|---|---|
| (1) The Ligatureand(7)The Clothing | No evidence shows that the items contained biological material. Alternatively, the probative value of any exculpatory results would not overcome the mountain of evidence. | Court applied law-of-the-case doctrine to the failure to show that the items contained biological material. | The law-of-the-case doctrine applies based on the finding in *Swearingen I* that the probative value of the items would not overcome the incriminatory evidence. |
| (2) The Pantyhoseand(6) The Cigarette Butts | | No evidence shows that this item contained biological material. | The law of the case does not apply because the new affidavit shows that this item does contain biological material. |
| (3) The Hairs and(4) The Rape Kit | | | The law of the case does not apply because these are newly requested items that are per se |

biological material.

| (5) The Fingernail Scrapings | No evidence shows that then-existing technology could not yield probative results. Alternatively, the probative value of any exculpatory results would not overcome the mountain of evidence. | New statute defined this item as a biological material, but exculpatory results from this testing would not have changed the outcome of the trial. | The law-of-the-case doctrine applies based on finding that the probative value of exculpatory test results would not overcome the incriminatory evidence. |
|---|---|---|---|

**III. Swearingen Meets all the Requirements for DNA testing on the Hair Evidence and the Rape Kit, But He Does Not Meet the Requirements for Testing of the Pantyhose or the Cigarette Butts**

Having determined that the law-of-the-case doctrine applies to disallow testing of all of the items except for four items, I explain why the requirements of Chapter 64 are met with respect to (3) the hair evidence and (4) the rape kit, but not as to (2) the pantyhose or (6) the cigarette butts. Chapter 64 requires that the evidence contain biological material, that it is in a condition to be tested, that identity was an issue at trial, that the defendant would not have been convicted if favorable results had been obtained by DNA testing, and that the convicted person is not filing the motion to unreasonably delay execution. TEX.CODE CRIM. PROC. art. 64.03.

**A. The Hair Evidence and the Rape Kit**

All of these requirements are met in this case for the hair evidence and the rape kit. As discussed above, the applicable statute now defines the hair evidence and rape kit as per se biological material. *See id.*art. 64.01(a). The convicting court made a finding of fact that the hair evidence and rape kit remain in a condition to be tested, and the record supports that determination. On appeal, the State has presented a minimal challenge to the testing of these items, stating that the "existence of a sexual assault collection kit and hairs found on Ms. Trotter's clothing

has always been known to the parties, and [Swearingen] could have requested DNA testing of those items at any time." But a defendant's failure to request testing of an item earlier is no longer a part of the applicable statute, and it can no longer constitute a basis for rejecting a request for testing. *Swearingen II,* 424 S.W.3d at 37. I would defer to the convicting court's fact finding that the items remain available in a suitable condition for testing.

**\*14** A movant must show that identity was an issue at trial. No one disputes that Swearingen meets this requirement.

With respect to the requirement that he show by a preponderance of the evidence that he would not have been convicted if favorable DNA results from the items that he now requests be tested had been obtained at trial, I conclude that Swearingen satisfies this requirement as to the hairs and the rape kit. *See* TEX.CODE CRIM. PROC. art. 64.03(a)(2)(A). This Court's majority opinion suggests that, because our opinions in *Swearingen I* and *Swearingen II* held that Swearingen could not overcome the mountain of evidence in those appeals, it necessarily follows that he would be similarly unable to do so here. But, as explained above, the items requested in *Swearingen I* and *Swearingen II* are not the same as the ones requested here. It is true that this Court's previous rulings have detailed the mountain of evidence against Swearingen in holding that exculpatory DNA results would not have made a difference in his conviction. But a DNA test from a rape kit conclusively showing that the victim had sexual intercourse with another male within a few hours of her murder, and DNA results showing that hair on and near her body belonged to another person,

when viewed in combination with the evidence that was introduced at Swearingen's trial that the complainant had another person's DNA under her fingernails, would establish by a preponderance of the evidence that the jury would have acquitted him. It should not be forgotten that the mountain of evidence is circumstantial in nature, with the exception of the testimony of a jailhouse snitch and a letter written by Swearingen with details of the crime that, according to him, were in the autopsy report. The most incriminating circumstantial evidence linking Swearingen to violence against Trotter is the evidence that the pantyhose remnant found in his trailer, which had DNA from his wife and him, matched the other part of the pantyhose that was used as the ligature to kill Trotter, and police recovered from inside his truck two hairs matching Trotter's DNA profile that appeared as if they had been forcibly removed. I agree that all of the circumstantial evidence introduced by the State at Swearingen's trial strongly connects him to Trotter at some point prior to her death, and it is powerful evidence of Swearingen's guilt. But its persuasive value would be greatly undermined by new DNA evidence indicating that the rape kit and the hairs found on and near the victim's body contained a DNA profile inconsistent with Swearingen's DNA profile, particularly when fingernail scrapings also did not match Swearingen's DNA profile.[5]

[5] I note here that, even though DNA consistent with Swearingen's and his wife's DNA profiles were found on the pantyhose leg in their trailer, and even though DNA consistent with the victim's DNA profile was found in Swearingen's truck, we know from current statistical problems relating to DNA-mixture interpretation that even these results are fallible. In a circumstantial case such as this one, exculpatory results from the rape kit and hair evidence on and near the victim's body likely could affect the inferences made from the statistical probabilities of the profiles developed in the case. Furthermore, although there was testimony of a microscopic match between the leg of the pair of pantyhose in Swearingen's trailer and the ligature used to kill Trotter, that type of evidence seems reminiscent of bite-mark evidence that has recently been questioned, and its value would be significantly undermined by exculpatory results from the rape kit and hairs found on and near the victim's body.

**\*15** Finally, Chapter 64 requires that the movant show "by a preponderance of the evidence that the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice." *Id.* art. 64.03(a)(2)(B). In *Swearingen I,* this Court upheld the trial court's determination that his motion was filed for purposes of delay. However, under the statute as it existed then, it was permissible to hold it

against the defendant that he had not sought testing of the items earlier. *Swearingen I,* 303 S.W.3d at 736. Under the amended statute that applies here, it is improper to consider a defendant's failure to request the testing sooner. Furthermore, unlike the situation before us in *Swearingen I,* here the convicting court has recommended DNA testing and has made a factual finding that Swearingen has not filed this motion for purposes of delaying his execution. I would defer to that determination and hold that Swearingen's current motion is not filed for purposes of delay.

**B. The Pantyhose and the Cigarette Butts**

Although I conclude that the doctrine on the law of the case cannot be used as a proper basis for denying DNA testing on (2) the pantyhose and (6) the cigarette butts, I reach the same ultimate conclusion as this Court's majority opinion that DNA testing must be denied as to those items. Even if exculpatory results were obtained from the pantyhose, those results would not, by a preponderance of the evidence, show that the jury would have reached a different verdict in this case, in light of the fact that the pantyhose remnant was found in Swearingen's trailer, it contained DNA matching his and his wife's DNA profiles, and it matched the other part of the pantyhose that was used as the ligature to kill Trotter. Furthermore, even if exculpatory results were obtained from the cigarette butts, those results would not, by a preponderance of the evidence, show that the jury would have reached a different verdict in this case, given the testimony suggesting that the cigarette butts had been left by individuals who found the victim's body, and given that the victim's body was recovered after being outdoors for an extended period of time. In light of the slight probative value of any favorable results that might be obtained from testing on the pantyhose and the cigarettes, I cannot conclude that such results, by a preponderance of the evidence, would have affected the jury's decision, and thus I agree that testing is not required as to those items.

**IV. Conclusion**

The horrific nature of this crime cries for justice against the guilty person, but that punishment has yet to occur, in part, because of the State's persistence in challenging the trial court's orders granting DNA testing in this case. Given that Swearingen will be executed for this crime, can anyone rationally argue that the rape kit and hairs should not be tested when there is only circumstantial

evidence of guilt, even if it is a mountain of it, and testimony from a jailhouse snitch? I would hold that DNA testing should be conducted on the rape kit and hair evidence. Therefore, I respectfully dissent from the Court's reversal of the trial court's order granting Swearingen's motion for post-conviction DNA testing.

**All Citations**

--- S.W.3d ----, 2015 WL 6513883

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.



EXHIBIT B



# Forensic
# DNA Collection
# at Death Scenes
## A Pictorial Guide

Rhonda Williams, PhD
Roger Kahn, PhD



CRC Press
Taylor & Francis Group



CRC Press
Taylor & Francis Group
6000 Broken Sound Parkway NW, Suite 300
Boca Raton, FL 33487-2742

© 2014 by Taylor & Francis Group, LLC
CRC Press is an imprint of Taylor & Francis Group, an Informa business

No claim to original U.S. Government works

Printed on acid-free paper
Version Date: 20140131

International Standard Book Number-13: 978-1-4822-0369-1 (Paperback)

This book contains information obtained from authentic and highly regarded sources. Reasonable efforts have been made to publish reliable data and information, but the author and publisher cannot assume responsibility for the validity of all materials or the consequences of their use. The authors and publishers have attempted to trace the copyright holders of all material reproduced in this publication and apologize to copyright holders if permission to publish in this form has not been obtained. If any copyright material has not been acknowledged please write and let us know so we may rectify in any future reprint.

Except as permitted under U.S. Copyright Law, no part of this book may be reprinted, reproduced, transmitted, or utilized in any form by any electronic, mechanical, or other means, now known or hereafter invented, including photocopying, microfilming, and recording, or in any information storage or retrieval system, without written permission from the publishers.

For permission to photocopy or use material electronically from this work, please access www.copyright.com (http://www.copyright.com/) or contact the Copyright Clearance Center, Inc. (CCC), 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400. CCC is a not-for-profit organization that provides licenses and registration for a variety of users. For organizations that have been granted a photocopy license by the CCC, a separate system of payment has been arranged.

**Trademark Notice:** Product or corporate names may be trademarks or registered trademarks, and are used only for identification and explanation without intent to infringe.

**Library of Congress Cataloging-in-Publication Data**

Williams, Rhonda (Rhonda Clark), author.
   Forensic DNA collection at death scenes : a pictorial guide / Rhonda Williams, Roger Kahn.
   p. ; cm.
   Includes bibliographical references and index.
   ISBN 978-1-4822-0369-1 (hardcover : alk. paper)
   I. Kahn, Roger (Forensic scientist), author. II. Title.
   [DNLM: 1.  Forensic Medicine--methods--Atlases. 2.  DNA Fingerprinting--methods--Atlases.  W 617]

   RA1057.55
   614'.1--dc23                                                      2014001310

**Visit the Taylor & Francis Web site at**
**http://www.taylorandfrancis.com**

**and the CRC Press Web site at**
**http://www.crcpress.com**

# Introduction

# 1

## Introduction and History

The Harris County (Houston, Texas) Institute of Forensic Sciences began to send, on occasion, a trace evidence analyst to homicide scenes in the early 2000s. Crime lab analysts from the trace evidence section collected trace tape lifts from the decedent in search of foreign hairs, fibers, and other trace evidence that might link a perpetrator to the crime. It soon became apparent that traditional trace evidence rarely contributed to investigations. Even when a suspect was known, trace evidence seldom linked the individual to the crime. In the best of circumstances, comparisons led to matching class characteristics. Occasional associations, but not identifications, resulted. What is more, investigators only occasionally submitted the trace tape lifts for analysis. Lab officials began to question the value of the trace evidence collection project and whether the benefit was worth the cost. Over time the focus changed to DNA collection, primarily touch DNA. There were several reasons for this. On a couple of occasions, a pathologist's swab of a bruise or a very light stain on a homicide victim's skin revealed foreign DNA that helped link a suspect to the crime. These cases alerted the medical examiner staff to the potential power of touch DNA.

Around the same time, in 2007, the Harris County Forensic Genetics Laboratory began to encourage the submission of evidence from property crimes. Most crime laboratories will test DNA evidence from property crimes if success is nearly certain. Bloodstains, cigarette butts, and ski masks, for example, almost always yield complete DNA results, and most labs will test these items whether they are from crimes against persons or from property crimes. Complete, or nearly complete, DNA results are needed for entry into the FBI's national DNA database, known as CODIS. The database compares the DNA of millions of previously convicted offenders to the DNA from crime scenes. A match can strongly link a previously unidentified offender to a crime.

Few labs will test property crime evidence that was merely touched by the perpetrator as the odds of obtaining a useful DNA profile are much lower. Nonetheless, in 2007 the HCIFS Forensic Genetics Laboratory began in earnest to test large numbers of touch DNA samples from property crimes. To our surprise, touched objects often provided full or nearly full DNA profiles that matched an offender in CODIS. Investigators responded by submitting increasing numbers of touch DNA property crime DNA cases and since that time nearly half of HCIFS DNA cases from property crimes are solely touch DNA evidence. As a result, the HCIFS lab leads all Texas crime laboratories in the total number of CODIS offender matches and total number of matches from property crimes. While this was taking place, the trace evidence collection team was in transition and eventually the entire team as well as the team lead were forensic genetics analysts who had firsthand experience with touch DNA. They began to swab bindings and bruises on decedents in

1

addition to collecting trace tape lifts and they began to see surprising numbers of successes from the foreign DNA they recovered.

## The Program Matures

Today, the Trace DNA Evidence Collection Team, the TECT, is an accredited component of the HCIFS Crime Lab. In 2013, ASCLD/LAB accredited the TECT in the crime scene discipline of specifically for Trace/DNA Evidence Collection. The TECT has grown to ten forensic DNA analysts who view scenes with a keen appreciation for touch DNA. These analysts focus on collecting samples from areas where the assailant may have touched the decedent during a struggle or while moving the body. They also comprehensively sample bindings and wrappings in a search for foreign DNA.

The DNA analysts of the TECT are volunteers who work week-long, 24-hour call rotations in addition to their duties in the DNA lab. The call-out criteria is formalized in order to reduce the number of unnecessary scene responses. TECT staff members are called only to suspected homicides that meet at least one of these criteria [Figure 1.1].

1. The decedent has been found in a place other than the original crime scene; i.e., the body was transferred from one location to another.
2. The decedent was found bound or wrapped by, e.g., with duct tape, handcuffs, zip ties, belts, or a comforter.
3. The decedent was killed by means that required sustained close contact, e.g., sharp force trauma, strangulation, or blunt force trauma; or the investigation suggests that such close contact occurred prior to or contemporaneous with the death regardless of the cause of death.

When a crime scene is identified for potential TECT activity, a team member accompanies an HCIFS investigator day or night, in any weather.

TECT scenes are a small subset of the deaths to which the HCIFS responds. Harris County, including the City of Houston, has a population of 4.1 million people according to the 2012 U.S. Census Bureau, making it the third most populous in the United States while Houston is the fifth most populous metro area in the United States. The county spans more than 1700 square miles. The HCIFS includes the medical examiner service and a full-service crime laboratory. The medical examiner is responsible for responding to and investigating unexplained deaths throughout the county. Deaths that must be reported to the HCIFS are specified by state law (CCP, Article 49.25) and include deaths that are suspected to have resulted from physical or chemical injury, sudden and unexpected deaths, deaths under unknown circumstances, suspected suicides and homicides, and deaths of children.